## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Terrence T. Williams,                  )
                                       )
                    Plaintiff,         )
                                       )        Case No. 20 C 7281
        v.                             )
                                       )        Hon. Franklin U. Valderrama
William Garner, et al.,                )
                                       )
                    Defendants.        )

## MEMORANDUM OPINION AND ORDER

Terrence T. Williams (Plaintiff), formerly a pretrial detainee at the Will County Adult Detention Facility (WCADF), filed this *pro se* civil rights lawsuit under 42 U.S.C. § 1983, stemming from an incident that occurred on November 16, 2020, while he was confined at WCADF. Plaintiff alleges that officers used excessive force against him or failed to intervene in the use of excessive force, and performed an improper strip search of him. Plaintiff further alleges that certain officers violated his religious rights by seizing his Quran. Defendants have moved for summary judgment, as has Plaintiff. For the reasons that follow, Plaintiff's motion for leave to file his motion for summary judgment is granted. Plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted in part and denied in part as set forth below.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff filed a motion for summary judgment and a motion for leave to file that motion. The motion for leave to file is granted to the extent that the Court has

considered the summary judgment motion. The motion, however, is deficient, and is denied.

First, Plaintiff's Statement of Facts is improper. Plaintiff states that he adopts as his Statement of Facts his response to Defendants' Statement of Facts and his Declaration. (*See* Dkt. No. 232 at pg. 1.) As discussed below, however, Plaintiff's response to Defendants' factual statement largely consists of legal argument and improper denials, and therefore cannot form the basis of his own factual statement. *See Hinterberger v. City of Indianapolis*, 966 F.3d 523, 529 (7th Cir. 2020) (statement filled with argument and improper denials was properly stricken because requiring the Court to sift through such a statement would defeat the purpose of Local Rule 56.1).

Additionally, the first nine paragraphs of Plaintiff's Declaration, R. 234, consist of his argument that Defendants did not produce all the video evidence in this case, an issue that, as discussed below, has previously been litigated. The purpose of a declaration is to set forth admissible facts based on personal knowledge, not speculation, intuition, or "flights of fancy." *Norfolk S. Ry. Co. v. Glob. Tower, LLC*, 620 F. Supp. 3d 784, 792–93 (N.D. Ind. 2022).

Plaintiff's Declaration largely fails in this regard, as the remaining paragraphs include only a smattering of facts to which Plaintiff could properly testify, and instead largely consist of legal argument about what he believes the evidence will show. Plaintiff submitted a Supplemental Declaration, Dkt. No. 235, that consists of Plaintiff's explanation of the manner in which he responded to Defendants' summary

judgment motion, rather than facts relevant to this case. This also is not a proper factual statement under Local Rule 56.1.

Plaintiff's failure, even as a *pro se* plaintiff, to file a proper factual statement with his motion justifies denial of the motion. LR 56.1(a)(3); *see Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("[E]ven pro se litigants must follow procedural rules . . . ."). For the sake of completeness, the Court observes that the record before it does not support a finding of summary judgment in Plaintiff's favor on any of his claims even if he had properly filed a factual statement in support of his motion for summary judgment. Plaintiff's motion for summary judgment therefore is denied. The Court next turns to Defendants' motion for summary judgment.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### BACKGROUND

### I.      Northern District of Illinois Local Rule 56.1

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in the Northern District of Illinois. The rule is intended "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (cleaned up).[1] Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with

---

[1] This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Local Rule 56.1(d). LR 56.1(a)(2). Local Rule 56.1(d) requires that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." LR 56.1(d)(2).

The opposing party must then respond to the movant's proposed statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003). Specifically, a district court is not required to "'wade through improper denials and legal argument in search of a genuinely disputed fact.'" *Id.* (quoting *Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 529 (7th Cir. 2000)).

Because Plaintiff is proceeding *pro se*, Defendants served him with the required "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" as required by Local Rule 56.2. (Dkt. No. 213.) In response, Plaintiff filed a response to Defendants' Statement of Facts (Dkt. No. 233), a memorandum in response to Defendants' motion (Dkt. No. 231), a Declaration (Dkt. No. 234), and a Supplemental Declaration (Dkt. No. 235).[2]

---

[2]In addition to the foregoing, Plaintiff submitted responses to Defendants' individual declarations. (Dkt. Nos. 219-227, 236-237.) Plaintiff also submitted a response to the

Where Plaintiff has not properly responded to a certain fact or has admitted it, the Court will accept it as true to the extent supported by the record. *Lamz*, 321 F.3d at 683. Plaintiff's factual responses frequently do not comply with the Local Rules, *see* LR. 56.1(e)(2), (3), in that they do not cite to the record when disputing Defendants' asserted facts and consist of legal argument or unsupported conclusions, such as contending that certain factual statements made by Defendants lack foundation, are vague, or are irrelevant. The Court will disregard these responses. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (court may disregard any part of factual statement or response that consists of legal arguments or conclusions).

Nonetheless, although the Court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. 2011) (unpublished), it will generously construe the facts identified by Plaintiff to the extent they are supported by the record, or he could properly testify to them. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently). The Court will not look beyond the cited material, however. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

Additionally, Plaintiff's failure to strictly comply with Local Rule 56.1 is not a

---

individual paragraphs of the Will County Defendants' summary judgment motion. (Dkt. No. 230.) Theses responses are not proper under Local Rule 56.1, which is meant to streamline the Court's review of the record, and will be disregarded.

basis for automatically granting Defendants' motion. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Rather, the Court is mindful that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The Court applies these standards in evaluating the evidence.

## II. Relevant Facts[3]

At all relevant times, Plaintiff was a pretrial detainee at the WCADF, (Defs.' SOF, Dkt. No. 212, at ¶ 1.), and Defendants William Garner, Michael Zolecki, Matthew Kasperek, Kyle Sari, Derek Coppes, and Matthew Cortese were employed as deputies at the WCADF as members of the Emergency Response Team. (*Id.* at ¶¶ 2, 4, 6-9.) Defendants James DeMasi, Colin Wehr, and Emma Perez were employed as sergeants at the WCADF, (*Id.* at ¶¶ 3, 5, 12.), and Defendants Jeremy Frederiksen and James Rafinski were deputies at the facility. (*Id.* at ¶¶ 10-11.)

On November 16, 2020, Plaintiff was housed at WCADF's Medical Unit in Cell 37 of Dayroom 6. (*Id.* at ¶ 17.) Plaintiff's interactions on that date from approximately 3:30 p.m. to 4:07 p.m. were captured on facility and/or body camera video that was preserved by the WCADF and provided to Plaintiff in discovery.[4] (*Id.* at ¶ 18.)

---

[3]This Court has jurisdiction under 28 U.S.C. § 1331, and venue is appropriate under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred at WCADF which is located in Will County, within the Northern District of Illinois. (*See* Defs.' SOF, Dkt. No. 212, at ¶¶ 13-16.)

[4]Bernadette Landeros, the executive secretary at the WCADF, submitted a declaration stating that she assisted Defendants in gathering evidence in this matter. She is familiar with the process for storage of facility surveillance video and body camera footage at the jail. In particular, facility camera recordings are stored on a server for 60 days, and then automatically deleted unless a specific request is made to upload the recording to the data

Plaintiff disputes this, and says "much footage has been disclosed, but not all" but points to only his own Declaration in support of this assertion. (*See* Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 18.) In the Declaration (*see* Dkt. No. 234 at ¶ 9), Plaintiff accuses Landeros of being a "dishonest witness" and failing to disclose all the video evidence, but points to no evidence supporting this accusation. In any event, this issue has already been litigated. Magistrate Judge Fuentes denied Plaintiff's motion to compel discovery contending in part that Defendants did not disclose additional video footage, and this Court denied Plaintiff's motion for sanctions on this issue. (*See* Dkt. Nos. 186, 189.)

The video recordings were uploaded to the WCADF's data management system, and subsequently downloaded and produced un-edited, to Plaintiff in discovery. (Defs.' SOF, Dkt. No. 212, at ¶¶ 19-20.) On November 16, 2020, at approximately 3:52 p.m., Plaintiff began attempting to activate the fire sprinkler in Dayroom 6. (*Id.* at ¶ 21.)[5] Plaintiff was trying to activate the sprinkler because he was upset that he did not get enough time out of his cell. (*Id.* at ¶ 22.) The item that Plaintiff used to activate the sprinkler was his bent inhaler cap that was kept in his

---

management system. Landeros stated that with regard to the case at issue, when she received a request to produce documents and video, she conducted a search of the data management system and located the video evidence produced in this case. She did not withhold, alter, or edit any video files. (*See* Landeros Decl., Dkt. 212-1, Ex. U, at pgs. 114-117.)

[5] Plaintiff raises a legal objection that evidence related to his attempt to set off the sprinkler is unfairly prejudicial. (*See* Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 21.) But the events that led up to the alleged use of force and strip search are relevant to Plaintiff's claims, and the danger of undue prejudice is primarily a jury consideration, not a consideration at summary judgment. *Graham v. Town of Normal*, 2010 WL 582608, at \*2 n.3. (C.D. Ill. Feb. 10, 2010).

cell. (*Id.* at ¶ 23.) As Plaintiff was attempting to activate the sprinkler, the pod deputies came on the speaker and ordered Plaintiff to lockdown in his cell. (*Id.* at ¶ 24.) Plaintiff ignored these orders until he saw officers coming to his cell. (*Id.*) After Plaintiff saw officers coming to his cell, he stopped attempting to activate the sprinkler and locked down in his cell. (*Id.* at ¶ 25.)

James Rafinski and Jeremy Frederiksen were pod deputies in the Medical Unit on November 16, 2020. (*Id.* at ¶ 26.) When Deputies Rafinski and Frederiksen witnessed Plaintiff attempting to activate the sprinkler, they called for the Emergency Response Team ("ERT"). (*Id.* at ¶ 27.) Deputy Frederiksen retrieved a body camera and began recording Plaintiff's actions. (*Id.*)

Deputies Frederiksen and Rafinski called the ERT to remove Plaintiff from his cell so that a necessary search for contraband could be conducted in the cell and dayroom. This action was prompted by the pod deputies' observation of Plaintiff using an item to activate the sprinkler, leading them to believe Plaintiff was in possession of contraband. (*Id.* at ¶ 28.) The deputies also were concerned that Plaintiff could be in possession of a metal piece of the sprinkler. (*Id.*)

Plaintiff contends, in response, that Deputy Olino examined the sprinkler and determined it was still intact. (*See* Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 28.) He cites generally to the video evidence in this case, which, as discussed below, does not support this proposition.[6] Plaintiff asserts that there "was no contraband." (*Id.*)

---

[6]Olino, an ERT officer, was named as a Defendant in this case, but passed away. The Court appointed Mary Tatroe, Chief of the Civil Division of the Will County State's Attorney's Office, as a special representative for Olino. (Dkt. No. 52.) Defendants do not address this

It is WCADF policy and practice to remove a detainee from his or her cell when the cell is being searched for contraband. (Defs.' SOF, Dkt. No. 212, at ¶ 29.) When the ERT arrived, the officers approached Plaintiff's door and ordered Plaintiff to lock down so that they could search his cell for contraband. (*Id.* at ¶ 30.) It is ERT policy and practice to restrain and remove a detainee from his or her cell while it is being searched, for the safety of the officers and the detainee. (*Id.* at ¶ 31.)

Upon arriving at Plaintiff's cell, the ERT officers issued standard extraction orders: they instructed Plaintiff to turn around, kneel down, place his hands behind his back, and cross his legs. (*Id.* at ¶ 32.) Plaintiff complied with these directives. (*Id.* at ¶ 33.)

Once Plaintiff was in the correct position, Deputies Wehr and Kasperek entered the cell first and took hold of each of Plaintiff's arms. (*Id.* at ¶ 34.) Deputy Sari followed and secured Plaintiff's hands into handcuffs. (*Id.*) Plaintiff disputes this based on his recollection of "one officer cuffing and holding the Plaintiff and upon removal from the cell other officers or ERTs engaged." (*See* Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 34.) Defendants assert that Plaintiff did not resist at this time and that deputies did not yank or twist Plaintiff's arms during this interaction. (Defs.' SOF, Dkt. No. 212, at ¶ 35.) Plaintiff admits that he was not resisting, but states that the video evidence will show officers "yanking and twisting" his wrist. (*See* Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 35.)

---

appointment, but simply state that Olino is no longer a defendant. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J., Dkt. No. 217, at pg. 6 n.1.).

ERT officers under these circumstances would not ask a detainee to put his hands through the chuckhole to be handcuffed, and none of the ERT officers have done this, because attempting to handcuff someone in that manner creates an unsafe situation. (Defs.' SOF, Dkt. No. 212, at ¶ 36.) Plaintiff disputes this, and contends that officers used the chuckhole to secure detainees both before and after this incident. (*See* Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 36.)

Once Plaintiff was secure in the handcuffs, Deputies Kasperek and Sari helped Plaintiff get to his feet and walked him to face the wall in the Medical Unit while other ERT officers searched his cell for contraband. (Defs.' SOF, Dkt. No. 212, at ¶ 37.) Deputies Kasperek and Sari assert that they did not apply any substantial pressure to Plaintiff's handcuffs or wrists and did not push him up against the wall when they held him in place. (*Id.* at ¶ 38.) They state that they kept their hands on Plaintiff's wrists and stood with him facing the wall for approximately five minutes to keep Plaintiff secure as his cell was searched. (*Id.* at ¶ 39.)

Deputies Sari and Kasperek escorted Plaintiff back to his cell after it had been searched and cleaned. (*Id.* at ¶ 40.) They assert that they did not yank or twist Plaintiff's handcuffs while they walked him back to his cell. (*Id.*) Rather, Deputies Sari and Kasperek state, they grabbed Plaintiff under the arm/elbow and wrists/handcuffs to ensure that he remained in their control as he was transported to his cell, as is standard practice. (*Id.*) Plaintiff disputes this sequence of events by contending, generally, that the "exhibits" (presumably the video evidence) "display contrary to the defense theory." (*See* Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 37.)

Once back in Plaintiff's cell, the officers ordered him to get on his knees, and then prone on the ground. (Defs.' SOF, Dkt. No. 212, at ¶ 41.) He complied with these commands. (*Id.*) Once Plaintiff was prone on the ground, officers performed a strip search. (*Id.* at ¶ 42.) Performing a strip search is standard procedure when the officers suspect that a detainee may be in possession of contraband. (*Id.* at ¶ 43.)

Defendants assert that they did not permit Plaintiff to strip on his own because of his volatile state and because officers believed that if Plaintiff possessed contraband, he would attempt to conceal it. (*Id.* at ¶ 44.) Plaintiff contends that Defendants' own exhibits (again, presumably a reference to the video evidence) do not support this proposition, but does not explain how so. (*See* Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 44.)

The officers believed that Plaintiff was in possession of contraband that he used while trying to activate the sprinkler. (Defs.' SOF, Dkt. No. 212, at ¶ 45.) They also were concerned that Plaintiff might have been in possession of a broken piece of metal from the sprinkler. (*Id.*) In response, as noted above, Plaintiff contends that the video evidence shows that Deputy Olino determined the sprinkler to be intact. (*See* Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 45.) He does not point to a specific portion of the video evidence, however, and the video evidence reviewed by the Court does not support this proposition.

During the strip search, Deputies Kasperek and Sari held Plaintiff's arms/wrists and assisted Deputy Garner in removing Plaintiff's shirt, pants, and socks to search him. (Defs.' SOF, Dkt. No. 212, at ¶ 46.) The officers used scissors to

cut off Plaintiff's shirt so it could be removed while he was still handcuffed. (*Id.* at ¶ 47.) The officers provided Plaintiff with a new set of clothes following the strip search. (*Id.* at ¶ 48.)

During the search, Deputy Sari placed his knee on Plaintiff's lower back to ensure that Plaintiff did not attempt to stand up during the search. (*Id.* at ¶ 49.) Deputy Sari denies applying pressure to Plaintiff's back with his knee, and asserts that placing his knee in this area is standard practice. (*Id.*) Plaintiff contends that Deputy Sari applied "unnecessary" pressure and placed his knee in Plaintiff's buttocks. (Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 49.)

During the search, Deputy Garner removed Plaintiff's pants and performed a visual search of Plaintiff's buttocks for contraband, which he states is standard practice. (Defs.' SOF, Dkt. No. 212, at ¶ 50.) He states that he did not caress or pinch Plaintiff's buttocks, and the search was not sexual in nature. (*Id.* at ¶ 51.) Plaintiff disputes this, asserting that the video evidence and his own recollection do not support Deputy Garner's statement. (Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 51.) He does not explain what he means by this or why he believed the search to be sexual in nature, however. (*Id.*) Once the search was over, officers removed Plaintiff's handcuffs and left his cell. (Defs.' SOF, Dkt. No. 212, at ¶ 52.)

According to Plaintiff, Sgt. Perez, Deputy Frederiksen, Deputy Wehr, and Deputy Rafinski were present throughout the incident and did not physically use force on him, but did not intervene to prevent the force from occurring. (*Id.* at ¶ 53.)

Plaintiff's personal items, including his Quran, were removed from his cell during the search. (*Id.* at ¶ 54.)

Once Plaintiff was secured back in his cell, his personal items, including his property bin and Quran, remained in Dayroom 6. (*Id.* at ¶ 55.) The pod deputies then removed these items and searched them for contraband, which is standard practice at the WCADF. (*Id.* at ¶ 56.) After the pod deputies finished their search, they stored the items in bins/bags to be placed in property storage, which also is standard policy and practice at the WCADF. (*Id.* at ¶ 57.)

After the items were placed in property, Plaintiff filed a Form 22 inmate request form on November 16, 2020, asking that his property, including his Quran, be returned. (*Id.* at ¶ 58.) When a detainee fills out a Form 22 request for the return of property, it is first reviewed by the on-duty pod deputy. (*Id.* at ¶ 59.) After receipt, the deputy brings the request to the on-duty property sergeant. (*Id.* at ¶ 60.) The property sergeant approves or denies the request, and indicates his or her reasoning on the request form, which is then returned to the detainee. (*Id.* at ¶ 61.) If the request is approved, the property sergeant contacts the property clerk and the clerk brings the item to the pod, where the on-duty pod deputy returns the item to the detainee. (*Id.* at ¶ 62.) There is no specific timeframe for these actions to occur, as timing is based on when during each officer's shift they are able to get to it. (*Id.* at ¶ 63.) Generally, however, the process for property to be returned to a detainee after a request takes between one and three days. (*Id.* at ¶ 64.)

Plaintiff filed four Form 22 requests for his Quran to be returned between November 16 and November 18, 2020. (*Id.* at ¶ 65.) The first request was received and signed by the pod deputy on Nov ember 17, 2020. (*Id.* at ¶ 66.) Jail records indicate that Plaintiff's Quran was returned to him on November 18, 2020, at approximately 5:02 p.m. (*Id.* at ¶ 67.) After November 18, 2020, Plaintiff made no further requests for his Quran to be returned to him. (*Id.* at ¶ 68.)

None of Plaintiff's requests to have his Quran returned were denied, and Defendants assert that it was returned to Plaintiff within one day of receipt of his first request, which is consistent with WCADF policy and procedure. (*Id.* at ¶ 69.) Neither Sgt. DeMasi nor Sgt. Perez directed any staff member to take Plaintiff's Quran or throw it away. (*Id.* at ¶ 70.) Neither Sgt. DeMasi nor Sgt. Perez had any involvement in reviewing Plaintiff's request forms or returning the Quran to Plaintiff. (*Id.* ¶ 71.) Neither Sgt. DeMasi nor Sgt. Perez had any specific knowledge that Plaintiff did not have his Quran following the November 16, 2020, incident. (*Id.* at ¶ 72.)

Plaintiff's response to these facts regarding his Quran is not a model of clarity. Specifically, Plaintiff's factual response is not clear as to whether or when his Quran was returned, although he apparently disputes that it was returned on November 18, 2020. (Pl.'s Resp. to Defs.' SOF, Dkt. No. 233, at ¶ 55.) Plaintiff apparently contends that he was still requesting his Quran as of November 19, 2020, but the documents he points to do not fully support this assertion.

First, Plaintiff points to a request form seeking the return of his legal mail, address book, and hygiene items. The form does not mention his religious text. (*Id.*; *see* 11/19/2020 request form, Dkt. No. 212-1, at pg. 142.) Plaintiff also points to a November 19, 2020 grievance complaining about the seizure of his belongings, but Plaintiff does not state in that grievance that his Quran had not been returned. (*Id.*; *see* 11/19/2020 grievance, Dkt. No. 212-1, at pg. 188.) Similarly, Plaintiff points to a November 18, 2020, grievance in which he states that Sgt. Brooks and Sgt. Mort "unlawfully sort[ed]" his legal mail and discarded certain mail, but this grievance does not complain about the loss of his Quran, and the grievance response indicates that the Quran had been returned to Plaintiff. (*Id.*; *see* 11/18/2020 grievance, Dkt. No. 212-1, at pg. 158.)

Plaintiff points to other grievances and appeals that he contends suggest he was "still missing his things," (*Id.*), including a November 21, 2020 grievance appeal in which he complains about "missing and trashed" items. (*Id.; see* 11/21/2020 grievance appeal, Dkt. No. 212-1, at pg. 155.) It is unclear from the grievance appeal whether Plaintiff is contending his Quran is still missing, but he does not ask for its return. (*Id.*)

Finally, Plaintiff points to a November 19, 2020 grievance, in which he also complains that the items were "trashed and disorganized" but does not request the return of his Quran. (*Id.*; *see* 11/19/2020 grievance, Dkt. No. 212-1, at pg. 159.) Although Plaintiff's factual response is altogether unclear as to how long he went without his Quran, he states in his memorandum in response to the motion that it

was "never returned" to him, and was "discarded." (*See* Pl.'s Mem. in Resp. to Defs.'
Mot. for Summ. J., Dkt. No. 231, at pg. 2.)

The Court has reviewed the surveillance and body camera footage submitted
in support of the motion. Exhibit A, taken from the Pod Dayroom camera, shows
Plaintiff exiting his cell at the 21:56 mark, wearing a red jail uniform. Shortly after,
he returns to his cell and retrieves what appears to be a piece of paper. At 22:43,
Plaintiff climbs onto a dayroom table and attempts to cover the camera with the
paper, though it does not stay in place. He then appears to tamper with something
overhead. At 23:28, Plaintiff engages in a back-and-forth with an officer, stating his
intention to pop the sprinkler because he believes he should not be in a dayroom with
one.

Plaintiff subsequently tells the officer to lock him down and resumes
tampering with the sprinkler. At 24:08, he dismounts the table, goes to his cell to
retrieve what looks like part of an inhaler, and continues his efforts. At 25:20,
Plaintiff stops again and returns to his cell, at which point water can be seen dripping
from the sprinkler. Shortly thereafter, officers approach Plaintiff's cell and instruct
him to turn around and kneel so he can be handcuffed. During the handcuffing
process, which is obscured due to the officers' positioning, Plaintiff complains that the
handcuffs will be slammed on and scar his wrists. He curses at the officers as they
extract him from the cell.

Exhibit C is a Pod Officer surveillance video, presented without sound, that
offers a slightly different perspective on some of the events described above. The

footage shows Plaintiff being extracted from his cell and placed against a wall outside the dayroom, where he is mostly out of view. During this time, officers are seen searching his cell and inspecting the sprinkler. At approximately 32:27, Plaintiff is brought back into the cell, where the strip search takes place. However, the view inside the cell is obscured by officers standing in the doorway. About three minutes later, the officers exit the cell and leave.

Exhibit G is body camera footage depicting officers responding to Plaintiff's cell. Approximately 45 seconds into the video, officers can be heard stating that they need to remove Plaintiff from his cell because he has a "piece of it," apparently referring to the sprinkler. The video captures Plaintiff's extraction from the cell, and at around the 2-minute mark, Plaintiff is handcuffed. Before the handcuffs are applied, Plaintiff complains about the officers being aggressive. The video does not show the entire handcuffing process. Plaintiff does not appear to be in distress as he is escorted out of the cell, though he asks officers to "loosen up." At approximately 2:26, Plaintiff is placed against the wall and again requests that officers "loosen up" on his wrists, accusing them of "twisting" his wrists.

When Plaintiff tells officers to go ahead and break his wrist, an officer responds that he is just holding Plaintiff in position. Plaintiff's wrists are not visible at this time. At about 2:54, Plaintiff states that his hand is bleeding. An officer asks if Plaintiff cut himself. Plaintiff then states that he did not cut himself, and the officers must have done it, which one of the officers denies. It appears that officers are attempting to search Plaintiff at this time, as one asks him to lift his leg. Plaintiff

responds belligerently to this request and curses at officers. At 5:23, Plaintiff states, "every day I'm popping that sprinkler, man." When an officer tells him that they cannot let him out of his cell if he is destroying the facility, Plaintiff states, "I'm gonna do that regardless."

When Plaintiff is brought back into his cell, he states that he should be able to strip himself. Officers instruct him to lay down on his chest and proceed to cut off his clothes. During this process, Plaintiff hurls homophobic slurs at the officers, and at 8:13, threatening to "murder all you bitches." Throughout the search, Plaintiff repeatedly threatens to sue officers. At approximately 8:28, he complains about an officer having their knee in his in Plaintiff's buttocks but does not raise concerns about any other specific conduct by the officers during the search.

Exhibit F is body camera footage that begins with Plaintiff on the dayroom table tampering with the sprinkler. At about 1:00 into the video, an officer can be heard saying that Plaintiff popped the sprinkler and has pieces, and warning other officers to be careful. The video then shows another angle of the events depicted in Exhibit G. The handcuffing process is not visible on this video due to the way the officers are positioned. While Plaintiff can be heard complaining that the officers are twisting his wrist at 3:36, the video does not clearly show what is or is not happening to his wrists. The events surrounding the strip search also are not visible on this video.

Exhibit H is also body camera video that shows another view of the events shown in Exhibits F and G. It does not show the handcuffing process due to the way

18

the officers are positioned, and again does not show Plaintiff's wrists at the time Plaintiff is complaining that officers are twisting them. As noted above, the officers attempt to search Plaintiff while he is against the wall, and he can be heard complaining that he will be "proned out" for a search. The strip search proceeds as described above.

Exhibit D is surveillance video of the Medical Pod that appears to show Plaintiff being held in place near a wall for about four and a half minutes after being extracted from his cell. The video is dimly lit and from a distance. Exhibit E is surveillance video from the Medical Desk that shows Plaintiff being led out of the dayroom and taken to stand against the wall, but at that point he is off camera until he is escorted back to his cell.

At no point in the video evidence does the Court observe Deputy Olino (or anyone else) stating that the sprinkler was still fully intact following Plaintiff's attempt to tamper with it.

Plaintiff sued and alleges that Defendants Kasperek, Garner, Zolecki, Sari, Wehr, Coppes, and Cortese used excessive force against him in violation of his constitutional rights. (*Id.* at ¶ 13.) Plaintiff also alleges that Defendants Kasperek, Garner, Zolecki, Sari, Wehr, Coppes, Cortese, Perez, Frederiksen, Rafinski, and DeMasi failed to intervene in the excessive use of force against him in violation of his constitutional rights. (*Id.* at ¶ 14.) Additionally, Plaintiff asserts that Defendants Perez and DeMasi violated his First Amendment right to Free Exercise of his religion. (*Id.* at ¶ 15.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine when a genuine dispute of material fact exists, the Court must assess the evidence in the record as presented in depositions, documents, affidavits or declarations, and other materials. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).

The parties seeking summary judgment bear the initial burden of showing the grounds for their motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once they have done so, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The Court must construe all facts in the light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). "A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.* However, a bare contention by the non-moving party

that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture," *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up). Further, when there is video evidence in the record, the Court may "take stock of what the video evidence shows without favoring [the non-movant] where the video contradicts his view of the facts." *See Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 984 (7th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)).

Cross-motions for summary judgment do not alter the standard for summary judgment. The Court must still "construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). Put another way, in evaluating cross-motions for summary judgment, the Court takes "the facts in the light most favorable to the non-movant first and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003). The existence of cross motions for summary judgment does not imply that there are no genuine issues of material fact. *Id.* at 647.

## ANALYSIS

As to the excessive force claims, Defendants argue that: (1) Deputy Sari did not use any improper force in handcuffing Plaintiff; (2) Deputies Sari and Kasperek did not use improper force in escorting Plaintiff out of his dayroom into Medical Unit, and holding him in place for approximately five minutes during the search of his cell;

and (3) because no improper force was used, the failure to intervene claims must necessarily fail. The Court addresses each argument in turn.

By way of background, the Due Process Clause of the Fourteenth Amendment governs claims of excessive force by a pretrial detainee. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). Under the Fourteenth Amendment, an officer's use of force is excessive when it amounts to punishment. *Id.* at 397. This can occur when force is used with "'an expressed intent to punish,'" is "not 'rationally related to a legitimate governmental purpose,'" or "'appear[s] excessive in relation to that purpose'" when viewed objectively. *Id.* at 398 (quoting *Bell v. Wolfish,* 441 U.S. 520, 538, 561 (1979)).

To prevail on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396–97. Whether the force was objectively unreasonable "turns on the facts and circumstances of each particular case," and depends on factors such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; and any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397 (cleaned up). These factors should be considered from the perspective of what a reasonable officer on the scene would have understood, not through the use of hindsight. *Id.*

"[N]ot every unjustified or malevolent touch" by a correctional officer violates the Fourteenth Amendment. *Williams v. Dart*, No. 18 C 506, 2018 WL 11239692, at

*2 (N.D. Ill. May 10, 2018) (Tharp, J.) (collecting cases holding that use of *de minimis* force against pretrial detainees does not violate Constitution). But injury and force "are only imperfectly correlated," *see Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010), and "[t]he absence of significant injury will not defeat a claim of excessive force." *Williams v. Stauche*, 709 F. App'x 830, 834–35 (7th Cir. 2017) (unpublished) (citing *Hudson v. McMillian*, 503 U.S. 1, 4 (1992)).

### A. Plaintiff's Excessive Force/Failure to Intervene Claims Related to the Use of Handcuffs

Beginning with the excessive force claims related to the use of handcuffs, Plaintiff essentially contends that Defendants applied handcuffs "immediately too tight" and then bent or twisted his wrists, causing him pain and injury. (Pl.'s Dep., Dkt. No. 212-1, Ex. I, at 19:9-22.) Defendants deny these allegations.

It is well-established that an "officer may not knowingly use handcuffs in a manner that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or further injury," *see Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (Fourth Amendment context); *see also May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000). However, in this case, the available video evidence does not provide a definitive resolution. That is, the footage does not clearly show the condition of Plaintiff's wrists or the alleged actions of the Defendants during the time Plaintiff was making his complaints.

A court may rely on the video evidence to grant summary judgment only where the video leaves no room for interpretation by a fact finder. *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481–82 (7th Cir. 2023); *see Ferguson v. McDonough*, 13 F.4th 574, 581

23

(7th Cir. 2021) (declining to interpret video evidence in favor of defendant where the video was open to interpretation and did not "utterly discredit" the plaintiff's version of events).

For these reasons, the Court denies Defendants' motion for summary judgment on the handcuff-related excessive force claims. As the Court understands it, only Deputies Sari and Kasperek appear to have participated in either handcuffing Plaintiff or holding him in place while handcuffed. Accordingly, the excessive force claims concerning the handcuffs will proceed solely against these two Defendants. Because the Court is allowing a portion of the excessive force claims to proceed, it also will allow the failure to intervene claims to proceed against the remaining Defendants as to the handcuff-related claims. *See Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (officers who have a realistic opportunity to step forward and prevent use of excessive force but fail to do so may be liable).

## B. Plaintiff's Strip Search Claims

Regarding the strip search, Plaintiff's asserts that it was unnecessary and carried out in a harassing manner, implicating the Fourth and Fourteenth Amendments.

The Fourth Amendment "protects prisoners from searches that may be related to or serve some institutional objective, but where guards nevertheless perform the searches in an unreasonable manner, in an unreasonable place, or for an unreasonable purpose." *Henry*, 969 F.3d at 781 (citing *Bell*, 441 U.S. at 559). When evaluating the reasonableness of a strip search, courts must consider "the scope of

the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 779.

In conducting this evaluation, courts must afford correctional administrators "'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* at 783 (quoting *Bell*, 441 U.S. at 547). In the absence of substantial evidence indicating that correctional officials exaggerated their response to security concerns, courts ordinarily should defer to their judgment in such matters. *Id.*

It is widely recognized that correctional officials may strip search inmates due to security concerns, provided that such searches are conducted in an appropriate manner. *Id.; see West v. Radtke*, 48 F.4th 836, 853 (7th Cir. 2022) ("It is well established that strip searches of inmates performed for security purposes are reasonable as a general matter."). Specifically, under the Fourth Amendment, strip searches of pretrial detainees are deemed reasonable if correctional officers have a reasonable suspicion that the detainee possesses contraband. *Brown v. Polk Cnty., Wis.*, 965 F.3d 534, 539–40 (7th Cir. 2020).

Here, the record indicates that officers conducted a brief strip search of the Plaintiff inside his cell after he attempted to activate a sprinkler in the dayroom. Plaintiff characterizes the belief that he possessed a part of the sprinkler or other contraband as "false speculation" (*See* Pl.'s Mem. in Resp. to Defs.' Mot for Summ. J., Dkt. No. 231, at pg. 3). He claims, as previously stated, that Deputy Olino confirmed

the sprinkler was intact upon entering the dayroom but provides no evidence to support this claim (*Id.*). Additionally, Plaintiff argues that he "fully cooperated" with the Defendants during the incident and, therefore, should have been allowed to strip on his own (*Id.*).

As in a separate case with similar claims, *Williams v. Perillo*, No. 20-cv-7530, Plaintiff contends he was subjected to an "indiscriminate strip search policy" and cites case law that is not analogous to the current matter. For instance, in *Calvin v. Sheriff of Will Cnty.*, 405 F. Supp. 2d 933, 947 (N.D. Ill. 2005), the court found that a blanket strip search policy must be justified by a legitimate need to ensure institutional security. However, the *Calvin* court explicitly excluded situations where officers had "reasonable individualized suspicion" to conduct such a search (*Id.* at 944). Similarly, Plaintiff cites *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983), where the Seventh Circuit ruled that strip searches of female misdemeanor offenders briefly detained while awaiting bond were unreasonable in the absence of reasonable suspicion of the risks of concealed weapons or contraband. Neither case addresses situations in which reasonable suspicion exists that a pretrial detainee is concealing contraband, as is relevant here.

The video evidence, Exhibit A, from 22:44 to 25:21, shows Plaintiff attempting to activate the sprinkler, at one point using what appears to be part of an inhaler, and exhibiting frustration when unsuccessful. Body camera footage further captures Plaintiff tampering with the sprinkler (*See, e.g.*, Ex. F, Dkt. No. 212-1, at 0:05-1:03). Plaintiff admitted during deposition that he tried to use a device retrieved from his

cell to activate the sprinkler (*See* Pl.'s Dep., Ex. I, Dkt. No. 212-1, at 7:10:13), and on the surveillance video (Ex. A at 23:36), he acknowledges his attempt to "pop" the sprinkler. The body camera footage also reflects the Defendants' concerns that the Plaintiff may have obtained a piece of the sprinkler (*See* Ex. F, Dkt. No. 212-1, at 1:00-1:20; 1:55-2:05). Put plainly, Plaintiff's claim that the officers lacked a valid basis for believing he possessed contraband is contradicted by the clear video evidence (*See Kailin*, 77 F.4th at 481). Thus, the strip search was justified under the circumstances (*See Jones v. DeGrave*, No. 22-2123, 2024 WL 1988835, at *2–3 (7th Cir. May 6, 2024) (unpublished)).

Next, Plaintiff argues that the strip search was conducted in an unreasonable manner, asserting that he would have cooperated if allowed to undress independently. However, the Defendants' declarations explain that they chose not to permit this due to concerns over the Plaintiff's "volatile" state and the potential risk of concealing contraband while undressing. Although the Plaintiff claims to have complied fully with the officers' orders despite "verbal agitations [sic]" (*See* Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J., Dkt. No. 231, at pg. 2), the video evidence reveals he was verbally combative during the interaction (*e.g.*, threatening officers, cursing at Sgt. DeMasi, and making threats involving the sprinklers).

Furthermore, during the strip search, the Plaintiff used offensive language, slurs, and at one point threatened to kill the officers (*Id*. at 7:20-8:22). Given this behavior, it was reasonable for the officers to question the Plaintiff's willingness to cooperate and to decide that a "hands-on" strip search was necessary. (*See*, *e.g.*, Ex.

G, at 2:10-2:17, threatening to knock out officers, at 4:36-45, cursing at Sgt. DeMasi, and at 5:22-42, threatening to pop the sprinklers "every day" and addressing officers with a slur.).

Plaintiff also alleges that Deputy Sari applied "unnecessary pressure" by placing his knee in the Plaintiff's buttocks. However, Deputy Sari denies this claim, and the Plaintiff fails to provide additional details or evidence. Assuming there was some incidental contact, Plaintiff has not demonstrated that the brief, private search (completed in Plaintiff's own cell)—lasting only a few minutes—was conducted unreasonably (*See Williams v. Cook County*, No. 20 CV 1537, 2023 WL 8371979, at *7 (N.D. Ill. Dec. 4, 2023) (incidental contact with anus or genitals during a pat down search for contraband did not violate plaintiff's rights)).

Finally, Plaintiff suggests that the search was conducted to humiliate him, invoking the Fourteenth Amendment protections for pretrial detainees. Yet, the Plaintiff's only evidence is his personal belief, as stated in his deposition, that the officers' intention was to humiliate him. Such speculative claims are insufficient to withstand summary judgment (*See Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010)).

While all strip searches may inherently involve some level of humiliation (*Williams v. Schlacter*, 2024 WL 324395, at *2* (W.D. Wis. Jan. 29, 2024)), courts require evidence of more egregious conduct, such as lewd comments or sexually provocative acts, to sustain such claims (*Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003)). In this instance, the Plaintiff has not presented evidence of any such

misconduct, and the video evidence further confirms this absence. The Court notes that Plaintiff testified that from what my heart tells me, they were strip searching me to humiliate me." (*See* Pl.'s Dep., Ex. I, Dkt. No. 212-1, at 27:5-7.) But again, Plaintiff's unsupported characterization is insufficient to proceed past the summary judgment stage. *See Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill. 2010) (because reasonable inferences cannot be based on speculation, the Court need not accept a plaintiff's characterization of the facts as true). Therefore, summary judgment is granted in favor of the Defendants regarding the strip-search claims.

## C. Plaintiff's First Amendment and RLUIPA Claims Related to his Quran

As noted above, the Court allowed Plaintiff to proceed with claims against Sgt. Perez and Sgt. DeMasi under the First Amendment and Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, related to the seizure of his Quran.

Inmates retain a limited right to exercise their religious beliefs. *Garner v. Muenchow*, 715 F. App'x. 533, 536 (7th Cir. 2017) (unpublished) (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348–49 (1987)). Specifically, correctional officials "may not intentionally and substantially interfere with an inmate's ability to practice his faith unless the restriction is reasonably related to a legitimate penological interest." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *see also Dove v. Neal*, No. 3:21-CV-449, 2023 WL 8004892, at *4 (N.D. Ind. Nov. 16, 2023) (legitimate penological objectives include safety and security). To survive summary judgment,

Plaintiff needs to point to evidence from which a reasonable jury could find that Defendants "personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (cleaned up).

Here, Plaintiff asserts that, as a Muslim, he is obligated to recite the Quran at "particular terminals" of the day and night. He claims this practice was disrupted when Sgt. DeMasi and Sgt. Perez ordered the seizure of his Quran from his cell and directed that it be discarded. (*See* Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J., Dkt. No. 231, at pgs. 2-3.). However, Plaintiff does not provide any evidence in the record to substantiate his claim that these officers directed the Quran's disposal.

The Court finds no violation of Plaintiff's rights concerning the initial seizure of the Quran. The record indicates that Defendants were legitimately concerned about contraband in Plaintiff's cell following his attempt to activate the sprinkler. The decision to search Plaintiff's cell and confiscate items, including the Quran, served legitimate penological interests in maintaining security, and was not directed at or intended to interfere with Plaintiff's religious practice. *See Payette v. Hoenisch*, 284 F. App'x. 348, 353 (7th Cir. 2008) (unpublished) (inmate's First Amendment rights were not violated when officers removed all books from his cell because they believed he had previously used part of a book to form a chisel). Furthermore, a brief delay in returning the Quran, once properly seized, does not constitute a constitutional violation. *See Rapier v. Harris*, 172 F.3d 999, 1006 n. 4 (7th Cir. 1999)

("De minimis burdens on the free exercise of religion are not of constitutional dimension."); *see also Hoever v. Belleis*, 703 F. App'x. 908, 913 (11th Cir. 2017) (unpublished) (brief denial of religious study materials while in segregation for 20 days did not impose a substantial burden on prisoner's religious practice).

Viewing the record in the light most favorable to Plaintiff, even if the Quran was not returned to him, despite jail records indicating that it was returned on November 18, 2020, Plaintiff still cannot proceed against Sgt. DeMasi and Sgt. Perez.

There is no evidence in the record to suggest that either Sgt. DeMasi or Sgt. Perez was involved in the alleged failure to return the Quran or that they instructed anyone to dispose of it, as the Plaintiff claims. In fact, both officers expressly stated in their declarations that they played no role in the return of Plaintiff's personal items after the search and did not order the anyone to destroy or "trash" Plaintiff's Quran. (*See* DeMasi Decl., Dkt. No. 212-1, Ex. Q, at ¶¶ 47-48; Perez Decl., Dkt. No. 212-1, Ex. T, at ¶¶ 39-40.) Plaintiff has pointed to no evidence to the contrary.

To recover damages from a defendant in his or her individual capacity, a plaintiff must establish that the defendant was personally responsible for the deprivation of a constitutional right. *See Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023). A plaintiff cannot base a claim against a supervisory official on *respondeat superior* because § 1983 requires personal involvement on the part of each defendant. *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014). Personal involvement can be demonstrated where the conduct occurred at the defendant's direction or with his knowledge and consent. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)

("some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery."). While the Plaintiff asserts that he was deprived of his Quran for more than a brief period and that it substantially burdened his religious practice, there is no evidence linking this deprivation to the Defendants' actions. Accordingly, summary judgment is granted in favor of Sgt. DeMasi and Sgt. Perez, and the Court need not address the issue of qualified immunity.

Finally, as to Plaintiff's RLUIPA claim, under the RLUIPA, institutions that receive federal funds cannot impose a "substantial burden" on an inmate's religious exercise unless the measure taken is the least restrictive way to advance a compelling state interest. *Neely-Bey Tarik-El,* 912 F.3d 989, 1004 (7th Cir. 2019); *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003). RLUIPA applies to individuals acting under color of state law, *see* 42 U.S.C. § 2000cc-5(4)(A)(iii).

However, the Seventh Circuit has observed that every federal circuit to decide the issue has found RLUIPA does not authorize money damages against state officials in their individual capacities. *Walker v. Baldwin*, 74 F.4th 878, 881 n. 1 (7th Cir. 2023). The same reasoning applies to county officials acting in their individual capacities, limiting available remedies to declaratory and injunctive relief. *See Pearson v. Verse*, No. 22-CV-409, 2024 WL 519546, at *7 (W.D. Wis. Feb. 9, 2024) ("RLUIPA remedies against an individual government official are limited to declaratory and injunctive relief."); *see also Williams v. Redman*, No. 3:20-CV-196, 2021 WL 1907224, at *2–3 (N.D. Ind. May 12, 2021) ("RLUIPA does not permit a suit

against an individual for money damages because the individual does not receive federal funds.") (citing *Nelson v. Miller*, 570 F.3d 868, 886–87 (7th Cir. 2009), *abrogated on other grounds by Jones v. Carter*, 915 F.3d 1147, 1149–50 (7th Cir. 2019)).

Even if monetary damages were permissible, Plaintiff has not presented any evidence that Sgt. Perez or Sgt. DeMasi were personally involved in violating his rights under RLUIPA, which is required in order to hold them liable. *See Kramer v. Wisconsin Dep't of Corr.*, No. 10-cv-224, 2011 WL 13187095, at *5 (W.D. Wis. July 26, 2011) (collecting cases applying personal involvement requirement to RLUIPA claims); *see also Pilgrim v. Artus*, No. 9:07-CV-1001, 2010 WL 3724883, at *14 (N.D.N.Y. Mar. 18, 2010), *report and recommendation adopted*, No. 9:07-CV-1001, 2010 WL 3724881 (N.D.N.Y. Sept. 17, 2010) ("RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation.") (emphasis in original.)

The Court further observes that any RLUIPA claim for injunctive relief is moot given Plaintiff's release from the WCADF. *Walker*, 74 F.4th at 881 (citing *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012)). For these reasons, summary judgment is granted in favor of Defendants Sgt. Perez and Sgt. DeMasi as to the RLUIPA claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for leave to file his motion for

summary judgment [228] is granted, but his motion for summary judgment [229] is denied. The Will County Defendants' motion for summary judgment [210] is granted in part and denied in part. The motion is granted as to Plaintiff's First Amendment and RLUIPA claims regarding the seizure of his Quran and granted as to Plaintiff's Fourth and Fourteenth Amendment claims related to the strip search. The motion is denied as to the handcuff-related excessive force and failure to intervene claims identified above. Plaintiff's motion to reopen this case [248] is denied as unnecessary.

**Dated:**     March 19, 2025

_____
**United States District Judge
Franklin U. Valderrama**